1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

7

## EASTERN DISTRICT OF CALIFORNIA

8

| | |
|---|---|
| IRENE ESCAMILLA, ) | 1:07cv1082 DLB |
| ) | |
| ) | |
| Plaintiff, ) | ORDER REGARDING PLAINTIFF'S |
| ) | SOCIAL SECURITY COMPLAINT |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

9
10
11
12
13
14
15
16

## **BACKGROUND**

17

Plaintiff Irene Escamilla ("Plaintiff") seeks judicial review of a final decision of the

18

Commissioner of Social Security ("Commissioner") denying her applications for disability

19

insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social

20

Security Act.  The matter is currently before the Court on the parties' briefs, which were

21

submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate

22

Judge.[1]

23
24
25
26
27

_____

28

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  On January 30, 2008, the Honorable Oliver W. Wanger reassigned the case to the undersigned for all purposes.

# FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed her applications on June 22, 2005, and July 6, 2005, alleging disability since October 15, 2004, due to pain from her neck to her right arm, arm cramps and a bulging disc in her neck.  AR 81-85, 86-89, 98-107.  After being denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 40-44, 49-54, 55. On December 6, 2006, ALJ Christopher Larsen held a hearing.  AR 281-312.  ALJ Larsen denied benefits on February 15, 2007.  AR 11-21.  The Appeals Council denied review on June 9, 2007. AR 5-8.

Hearing Testimony

ALJ Larsen held a hearing on December 6, 2006, in Fresno, California.  Plaintiff appeared with her attorney, Robert Christenson.  Vocational expert ("VE") Kenneth Ferra also appeared and testified.  AR 281.

Plaintiff testified that she was 52 years old at the time of the hearing and completed high school.  AR 286.  She last worked in 2004 as a secretary/receptionist and stopped working due to pain in her arm.  AR 287.  Prior to that, she worked as a janitor and a grader in a packing house. AR 288.

Plaintiff explained that she has constant pain in her neck and that her "head feels like it's too heavy" for her neck.  The pain also runs towards her back, especially at night.  She has carpal tunnel syndrome ("CTS") in her right hand and gets cramps in her hand and fingers when she uses them a lot.  AR 290.  When she chops potatoes, "right away [her] fingers get stuck."  She is always on some kind of pain medication.  AR 291.

Plaintiff also suffers from depression because of her pain and her circumstances, i.e., not being able to work and living off her daughter.  She thought she could concentrate for 20 minutes at one time.  AR 291-292.

Plaintiff is right handed.  She explained that her upper arm hurts and cramps when she lifts things.  AR 292.  She can keyboard for about 30 minutes before her fingers cramp.  AR 293.

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1    She also explained that her neck hurts when she sits up straight.  Plaintiff could sit and look

2    straight ahead at a screen for about 10 minutes at a time.  She could sit for about 20 minutes and

3    stand for about an hour.  Twisting her head is also a problem and she can hear "grinding or

4    pulling" when she does so.  In an eight hour day, she estimated that she lays down for about four

5    hours because her head, neck and back get tired.  AR 295.  When she uses her right hand to

6    grasp, her index finger locks.  AR 296.  Bending and stooping is also difficult.  AR 301.

7         During a typical day, she gets up, brushes her teeth, eats breakfast and then reads and

8    watches television in her recliner.  AR 298.  She can drive, but not for long distances.  Plaintiff

9    took two Motrin to make the drive to the hearing.  She continues to have muscle spasms and

10    inflammation despite medication, which makes her drowsy.  AR 299, 301.  She has tried heating

11    pads to relieve the cramping and pain in her neck and hand, but the heat only provided temporary

12    relief.  AR 299-300.

13         When questioned by the ALJ, Plaintiff explained that when she worked for Kirk Cleaners,

14    she started noticing tingling in her fingers that eventually became radiating pain.  AR 302-303.

15         For the first hypothetical, the ALJ asked the VE to assume an individual of Plaintiff's

16    age, education and work experience.  This person can lift and carry 20 pounds occasionally, 10

17    pounds frequently, stand and walk a total of six hours and sit for six hours.  This person can

18    occasionally climb ladders, ropes or scaffolds and can frequently balance, stoop, kneel, crouch,

19    crawl and climb ramps or stairs.  This person can occasionally reach overhead, occasionally flex,

20    extend or rotate her neck, occasionally finger with the right dominant arm and hand, and

21    frequently grasp and handle with either hand.  This person can understand, remember and carry

22    out simple one or two step job instructions.  The VE testified that this person could perform

23    Plaintiff's past janitorial job.  AR 307-308.

24         If this person could never lift or carry over 10 pounds, this person could not perform any

25    of Plaintiff's past work but could perform some assembly jobs.  AR 308-309.  If this person

26    could maintain attention, concentration and pace for two hours, this person could not perform

27    any work.  AR 309.

28

For the second hypothetical, the ALJ asked the VE to assume an individual who could only occasionally use the right arm or hand to do anything, i.e., reach, finger, grasp.  This person could not perform Plaintiff's past relevant work, or any other jobs in the national economy.  AR 309.

For the third hypothetical, the ALJ asked the VE to assume a person who needed to have a minimum of one hour of unscheduled breaks, in addition to the customary breaks.  This person could not perform any work.  AR 309.

Plaintiff's attorney asked the VE to assume a person who could occasionally lift and carry 20 pounds, 10 pounds frequently.  This person could frequently balance, stoop, kneel, and crouch, and could occasionally crawl.  This person could occasionally reach with both arms and could occasionally finger with the right hand.  This person could not perform frequent fine manipulation with the right upper extremity.  The VE testified that this person could perform only one of Plaintiff's past jobs, but the title of the job was inaudible.  AR 310.

Medical Record

A chest x-ray taken on September 26, 2004, revealed an ill-defined ovoid density in the right upper lung, most consistent with a faintly calcified granuloma.  AR 151.  Cervical spine x-rays taken the same day revealed mild canal encroachment at C5-C6, mild to moderate degenerative joint disease at C5-6 and C6-7 with limited evaluation of C1-2 and C7-T1.  AR 152.

On December 16, 2004, Plaintiff was examined by James E. Lessenger, M.D.  She complained that her arm was weak and her neck was stiff.  Plaintiff reported that the pain started on September 13, 2004, at about 9:00 a.m., as she was typing.  She indicated that tingling started about a month prior.  On examination, her neck was tender, particularly in the right paravertebral musculature going into the right trapezius, but she had full range of motion.  Her grip strength was slightly reduced on the right.  Her back was non-tender and had full range of motion.  Bent and straight leg raises did not produce pain.  Plaintiff had full range of motion in all joints, and there was no swelling, tenderness or atrophy.  Dr. Lessenger assessed neck pain with pain, numbness and tingling radiating through the right trapezius, right shoulder and down the arm into

4

the right first, second and third fingers.  He noted that a cervical herniated nucleus pulposis, median nerve entrapment or shoulder pathology, although doubtful, should be considered.  Dr. Lessenger ordered an MRI of her cervical spine and nerve conduction studies of her right arm. Plaintiff was given Tramadol.  AR 162-166.

On January 6, 2005, Plaintiff underwent an MRI of her cervical spine.  The test revealed (1) a broad-based bulge and impingement at C6-7 resulting in moderate to severe central canal stenosis, moderate right neural foraminal stenosis and mild left neural foraminal stenosis; (2) a broad-based bulge indenting the thecal sac and impinging upon the cord, resulting in moderate to severe central canal stenosis and no significant neural foraminal stenosis; (3) a broad-based bulge indenting the thecal sac and impinging upon the cord, and mild bilateral hypertrophy resulting in moderate to severe central canal stenosis and mild bilateral foraminal stenosis; and (4) degenerative changes to the cervical spine, including near complete disc desiccation.  AR 172.

Plaintiff underwent a nerve conduction study on January 12, 2005, performed by Boota A. Chahil, M.D.  The study was abnormal and showed evidence of mild Carpal Tunnel Syndrome ("CTS") of the right median nerve across the wrist.  There was no evidence of polyneuropathy or ongoing cervical radiculopathy.  AR 174.

On January 21, 2005, Plaintiff saw Arthur S. Harris, M.D., in connection with her workers' compensation claim.  She complained of pain, limitation of motion and weakness in her cervical spine with radiation of pain into her right shoulder and upper back, as well as radiation of pain, numbness and tingling in the right upper extremity.  Upon examination, Plaintiff had tenderness to palpation in the right upper, mid and lower paravertebral muscles and the right trapezial region, with right lower spasm.  Range of motion was limited.  She also had tenderness to palpation in the right upper thoracic paravertebral muscles and mildly limited range of motion. There was positive impingement sign in her right shoulder as well as rotator cuff weakness. Plaintiff had patchy, decreased sensation in the right upper extremity in the C6 and median nerve distribution.  He diagnosed right cervical radicular syndrome and right rotator cuff tendinitis and impingement syndrome.  Plaintiff was instructed in home exercises and referred for a course of

1  physical therapy twice a week for four weeks.  Dr. Harris also prescribed medications and opined

2  that Plaintiff was temporarily totally disabled for six weeks.  AR 189-197.

3       Plaintiff returned to Dr. Harris on February 24, 2005, and continued to complain of pain

4  in the cervical spine with radiation of pain into the right upper extremity.  He noted that she had

5  not had any therapy because the insurance carrier had not authorized it.  On examination,

6  Plaintiff had limited range of motion in the cervical spine, limited range of motion in the right

7  shoulder and positive impingement signs and patchy decreased sensation in the right upper

8  extremity, most notably in a C6 distribution.  Dr. Harris reviewed the January MRI and

9  diagnosed Plaintiff with right cervical radicular syndrome, herniated nucleus pulposus, C6-7,

10  disc bulging at C4-5 and C5-6, and right rotator cuff tendinitis and impingement syndrome.  He

11  discussed treatment options with Plaintiff, including trigger point injections, epidurals, facet

12  blocks and surgery, but she was hesitant to proceed.  He therefore referred Plaintiff for a short

13  course of physical therapy and prescribed medications.  He noted that she was temporarily totally

14  disabled for six weeks.  AR 185-188.

15       Plaintiff saw Dr. Harris on March 17, 2005.  Her examination and Dr. Harris' diagnosis

16  were unchanged.  He told Plaintiff that clinically, she had no findings or complaints consistent

17  with CTS and he believed that her parathesis was associated with her disc herniation at C6-7.

18  Although they discussed treatment options again, Plaintiff was somewhat hesitant to proceed.

19  She was instructed to continue with exercises, medication and activities as tolerated.  Dr. Harris

20  opined that she was temporarily totally disabled for six weeks.  AR 181-183.

21       On May 13, 2005, Plaintiff returned to Dr. Harris.  She complained of worsening pain and

22  limited motion of the cervical spine with radiation of pain, numbness and tingling in the right

23  upper extremity, as well as localized pain in the right shoulder.  Her examination was unchanged.

24  Dr. Harris referred Plaintiff to pain management specialist Dr. Valdez to discuss cervical

25  epidurals.  Plaintiff was instructed to continue with exercises, medication and activities as

26  tolerated.  Although Plaintiff's nerve conduction studies were consistent with CTS, Dr. Harris

27  indicated that clinically, she did not have any findings consistent with CTS and that the

28  paresthesias in her right arm represents residual problems with cervical radiculopathy.  AR 177-

1  179.  He further indicated that Plaintiff was temporarily totally disabled for four weeks.  AR 179.

2  _____On July 19, 2005, Plaintiff saw David Larios, P.C.  She was taking Vicodin, Soma and

3  Lodine but stopped three weeks ago because it made her feel out of it.  On examination, there

4  was tenderness to palpation from posterior back region and decreased range of motion in her arm.

5  He diagnosed chronic neck pain and CTS on the right.  Dr. Larios referred Plaintiff to behavioral

6  health and prescribed an antidepressant.  AR 208.

7  _____Also on July 19, 2005, Plaintiff saw Sandra Santana, Psy.D., for evaluation of depression

8  and chronic pain.  On mental status examination, Plaintiff was alert, oriented and cooperative.

9  She reported her mood as depressed and reported passive suicidal ideation with no intent or plan.

10  Her affect was constricted and congruent with mood.  Her thought process was normal and

11  insight fair.  Dr. Santana diagnosed major depressive disorder recurrent, severe without psychotic

12  features, and pain disorder associated with both psychological features and general medical

13  condition, chronic.  Dr. Santana explained that Plaintiff needed to learn ways to cope and

14  decrease her alcohol intake.  Plaintiff indicated that she was trying to get disability, but Dr.

15  Santana did not believe she would be eligible because there are numerous jobs that don't require

16  full arm movement.  They discussed job training.  AR 204-205.

17  _____Plaintiff was seen at Family Healthcare Network on August 24, 2005, and given a carpal

18  tunnel brace.  Plaintiff indicated that she was unable to afford Neurontin, which was

19  recommended, and would explore options to receive physical therapy.  AR 201.

20  On October 2, 2005, Plaintiff saw Greg Hirokawa, Ph.D., for a psychiatric evaluation.

21  Plaintiff reported that she washes dishes and cleans the house as best she can.  She also reported

22  that she enjoys spending time with her daughter and grandchildren and has a few close friends.

23  On mental status examination, her mood appeared depressed and her affect was tearful.  Her

24  intellectual functioning appeared to be within the below average range but her memory was

25  intact.  She was able to perform a simple two-step command and her concentration for

26  conversation was adequate.  Dr. Hirokawa diagnosed major depressive disorder, single episode,

27  moderate.  Her current stressors were economic and health related.  Her GAF was 55.  The

28  likelihood of Plaintiff's improvement depended on her ability to return to work.  Plaintiff had a

fair ability to remember and understand very short and simple instructions, as well as detailed

instructions.  She had a fair ability to maintain concentration and attention, as well as a fair

ability to accept instructions from a supervisor and respond appropriately.  Her ability to sustain

an ordinary routine without special attention was fair, but her ability to complete a normal

workday and workweek without interruptions was poor based on her depression.  Her ability to

deal with changes in the work setting was fair, as was her ability to interact with coworkers.  The

likelihood of emotional deterioration in the work setting was moderate.  AR 209-213.

        Plaintiff saw Jamie Lewis, M.D., on October 15, 2005, for a neurologic examination.

Plaintiff was not currently taking any medications.  On examination, she had general muscle

weakness, myalgia and painful joints/arthritis.  She had decreased sensation, numbness and

tingling in her finger tips.  Tinel's and Phalen's tests were negative.  Plaintiff had limited range

of motion in her cervical spine and was tender to palpation.  Lumbar range of motion was normal

and straight leg raising was negative.  She had normal to slightly reduced motor strength in all

areas, and full reflexes with decreased sensation and dull discrimination in both C7 dermatomes.

Dr. Lewis diagnosed neck pain with spinal stenosis and radiculopathy with neurological deficits

of decreased triceps reflex on the right side, decreased triceps strength on the right side and

decreased C7 sensation in both arms.  He opined that Plaintiff had no limitations in standing,

walking or sitting.  She could occasionally bend, crouch, kneel and push, but should avoid

activities that would require frequent flexion or rotation of the neck.  She could frequently lift

and carry 10 pounds, 20 pounds occasionally.  Plaintiff could perform both fine and gross motor

manipulative tasks with both arms, but when performing repetitive tasks such as typing, Plaintiff

would need frequent rest breaks due to early fatigue.  AR 252-259.

        State Agency physician Archimedes Garcia, M.D., completed a Psychiatric Review

Technique form on October 31, 2005.  Dr. Garcia opined that Plaintiff had mild restrictions in

activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties

in maintaining concentration, persistence and pace.  AR 232-245.  In a Mental Residual

Functional Capacity Assessment, Dr. Garcia opined that Plaintiff was moderately limited in her

ability to understand, remember and carry out detailed instructions.  Plaintiff could understand

and remember simple instructions, maintain attention and concentration in two hour increments, be socially appropriate and adapt.  AR 246-248.

_____On November 22, 2005, State Agency physician Sadda Reddy, M.D., completed a Physical Residual Functional Capacity Assessment.  Dr. Reddy opined that Plaintiff could occasionally lift and carry 20 pounds, 10 pounds frequently, stand and/or walk for about six hours and sit for about six hours.  She was unlimited in pushing or pulling.  Plaintiff could frequently climb ramps or stairs and occasionally climb ladders, ropes or scaffolds.  She could frequently balance, stoop, kneel and crouch and could occasionally crawl.  She was limited to occasional reaching with both hands and occasional fingering with her right hand.  She was also limited to frequent (rather than constant) handling and feeling with her right hand.  AR 220-227.  This assessment was affirmed on April 10, 2006.  AR 227.

_____On March 10, 2006, Plaintiff saw Hanh My Hoang, M.D.  She complained that ibuprofen was not working and that she was still having pain.  Noting that there was "no change" in her physical examination, he assessed osteoarthritis, hypertension and obesity.  He prescribed Vicodin and instructed Plaintiff to continue to increase her exercise, lose weight, and eat a low fat, low salt diet.  AR 274.

_____Plaintiff saw Chi Nguyen, M.D., on September 9, 2006.  She complained of pain in her neck radiating to her right arm and middle of her right hand.  On examination, her neck was supple and she was able to perform range of motion "pretty well with flexion, extension and turning to the sides."  Dr. Nguyen assessed hypertension and neck pain.  He wanted to adjust her dose of blood pressure medications and instructed Plaintiff to lose weight, follow a low-salt diet, and return in six weeks.  AR 262.

_____ALJ's Findings

_____The ALJ determined that Plaintiff had the severe impairments of degenerative changes to her cervical sine and major depressive disorder.  AR 16.  Despite these impairments, Plaintiff retained the residual functional capacity ("RFC") to lift and carry 10 pounds frequently, 20 pounds occasionally, stand and walk for six hours and sit for six hours.  Plaintiff could occasionally climb ladders, ropes and scaffolds, occasionally reach overhead with the upper

9

extremities, and occasionally flex, extend or rotate her cervical spine.  She could occasionally
finger with the right arm and hand, but could frequently grasp and handle with either hand.
Plaintiff could understand, remember and carry out simple one or two step instructions.  AR 16-
17.

Based on this RFC and the testimony of the VE, the ALJ found that Plaintiff could
perform her past relevant work as a janitor.  AR 20.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision
to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,
the Court must determine whether the decision of the Commissioner is supported by substantial
evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla,"
*Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.
Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at
401.  The record as a whole must be considered, weighing both the evidence that supports and
the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,
995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must
apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).
This Court must uphold the Commissioner's determination that the claimant is not disabled if the
Secretary applied the proper legal standards, and if the Commissioner's findings are supported by
substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th
Cir. 1987).

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in
substantial gainful activity due to a medically determinable physical or mental impairment which
has lasted or can be expected to last for a continuous period of not less than 12 months.  42
U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of
such severity that he is not only unable to do her previous work, but cannot, considering his age,

1  education, and work experience, engage in any other kind of substantial gainful work which

2  exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

3  The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

4  Cir. 1990).

5        In an effort to achieve uniformity of decisions, the Commissioner has promulgated

6  regulations which contain, inter alia, a five-step sequential disability evaluation process. 20

7  C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994). Applying this process in this case, the ALJ

8  found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of

9  her disability; (2) has an impairment or a combination of impairments that is considered "severe"

10  (degenerative changes to her cervical sine and major depressive disorder) based on the

11  requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or

12  combination of impairments which meets or equals one of the impairments set forth in Appendix

13  1, Subpart P, Regulations No. 4; but (4) retains the RFC to perform her past relevant work as a

14  janitor.  AR 16-20.

15        Plaintiff argues that the ALJ erred (1) in analyzing Dr. Hirokawa's opinion; (2) by failing

16  to evaluate her mental impairments and resulting functional limitations as required by 20 C.F.R.

17  § 404.1520a; (3) by failing to present certain limitations to the VE; and (4) in failing to find her

18  statements credible.

19                                        **DISCUSSION**

20  A.      Dr. Hirokawa's Opinion

21        Based on her reading of the ALJ's opinion, Plaintiff argues that the ALJ "apparently"

22  accepts Dr. Hirokawa's finding that her ability to complete a normal workday and workweek,

23  without interruption, is poor.  Plaintiff therefore believes that the ALJ should have found her

24  disabled.

25        In his decision, the ALJ discusses Dr. Hirokawa's findings as follows:

26  Dr. Hirokawa found Ms. Escamilla able to understand and remember very short and
    detailed instructions, to maintain attention and concentration, to interact with coworkers

27  and supervisors, and to deal with changes in the workplace.  Dr. Hirokawa also stated Ms.
    Escamilla's ability to complete a normal workday and workweek without interruptions is

28  poor (Exhibit 10F, pp. 1-5).  But I do not accept his conclusion that Ms. Escamilla will

1  emotionally deteriorate in the workplace, because, according to Dr. Hirokawa, her
2  symptoms are primarily related to financial stressors and that improvement of her
   condition depends on her ability to return to work.

3  AR 19.  When the ALJ discussed the weight he accorded to each opinion, he explained that he

4  gave Dr. Hirokawa's assessment substantial weight, "apart from the previously-discussed mental

5  limitation."  AR 20.

6      Plaintiff believes that based on the language in the decision, the ALJ accepted Dr.

7  Hirokawa's belief that Plaintiff had a poor ability to complete a normal workday and workweek

8  and rejects only Dr. Hirokawa's finding that Plaintiff would deteriorate in the workplace.

9      As is the case with the opinion of a treating physician, the Commissioner must provide

10 "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining

11 physician.  *Pitzer*, 908 F.2d at 506. And like the opinion of a treating doctor, the opinion of an

12 examining doctor, even if contradicted by another doctor, can only be rejected for specific and

13 legitimate reasons that are supported by substantial evidence in the record.  *Andrews v. Shalala,*

14 *53 F.3d 1035, 1043 (9th Cir.1995).*

15     Plaintiff is correct that the ALJ did not specifically reject Dr. Hirokawa's finding that she

16 had a poor ability to complete a workday and workweek.  However, given the ALJ's treatment of

17 Plaintiff's other mental health evidence, any error must be considered harmless.  In *Magallanes*

18 *v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989), the Ninth Circuit explained:

19     It is true that the ALJ did not recite the magic words, "I reject Dr. Fox's opinion about the
20     onset date because...."  But our cases do not require such an incantation.  As a reviewing
       court, we are not deprived of our faculties for drawing specific and legitimate inferences
21     from the ALJ's opinion.  It is proper for us to read the paragraph discussing Dr. Pont's
       findings and opinion, and draw inferences relevant to Dr. Fox's findings and opinion, if
       those inferences are there to be drawn.

22     With this in mind, although the ALJ did not specifically address the limitation, the Court
23 can infer specific and legitimate reasons from the remainder of his decision.  Indeed, the ALJ

24 rejects the finding that Plaintiff would deteriorate at work because Dr. Hirokawa believed that

25 her symptoms were primarily related to financial stressors and that improvement of her condition

26 depends on her ability to work.  AR 19.  This reasoning likewise applies to Dr. Hirokawa's belief

27 that Plaintiff's ability to complete a normal workday and workweek is poor- the inconsistency

28

1   undermines the conclusion.  Moreover, Plaintiff told Dr. Hirokawa that she was actively seeking

2   work.  AR 210.  Dr. Hirokawa also noted that Plaintiff's  "attitude towards seeking employment"

3   was good and that her limitations appeared to be "primarily due to reported medial [sic]

4   problems."  AR 212.  Again, such inconsistencies are valid reasons for rejecting portions of Dr.

5   Hirokawa's opinion.

6           Further supporting the ALJ's finding is Dr. Santana's belief that it was important for

7   Plaintiff to find another job to improve her self-esteem.  AR 19, 205.  Plaintiff told Dr. Santana

8   that she was trying to get disability, but Dr. Santana explained that Plaintiff would not likely get

9   disability because many jobs do not require full arm movement.  AR 205.  They also discussed

10  job training.  AR 205.

11          Finally, the ALJ noted that Plaintiff had not received any psychiatric or ongoing

12  psychological therapy.  AR 19.  Lack of supporting treatment is a valid basis to reject a

13  physician's opinion.  *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001).

14          For these reasons, the Court finds that the ALJ set forth specific and legitimate reasons

15  for rejecting Dr. Hirokawa's belief relating to Plaintiff's ability to complete a workday or

16  workweek.

17          Insofar as Plaintiff contends that the ALJ improperly rejected Dr. Hirokawa's finding that

18  Plaintiff had a moderate likelihood of deteriorating in the workplace, her argument also fails.  As

19  explained above, the ALJ set forth the internal inconsistencies in Dr. Hirokawa's opinion as well

20  Dr. Santana's belief that Plaintiff *needed* to work to improve her mental state.

21          Plaintiff's arguments are without merit and must be rejected.

22  B.      20 C.F.R. § 404.1520a

23          Plaintiff next argues that the ALJ failed to evaluate her mental impairments and resulting

24  functional limitations as required by 20 C.F.R. § 404.1520a and § 416.920a.

25          20 C.F.R. § 416.920a sets forth the technique for evaluating a claimant's mental

26  impairments and identifies four broad functional areas in which a claimant's functional limitations

27  are rated.  These areas include activities of daily living, social functioning, concentration,

28  persistence, or pace, and episodes of decomposition. 20 C.F.R. § 416.920a(c)(3).  After the

1   degree of limitation is rated, the severity of a claimant's mental impairment is determined. 20

2   C.F.R. § 416.920a(d).  Throughout the application process, the Commissioner documents the

3   application of the technique.  At the administrative hearing level,

4          the written decision must incorporate the pertinent findings and conclusions based on the
           technique. The decision must show the significant history, including examination and
5          laboratory findings, and the functional limitations that were considered in reaching a
           conclusion about the severity of the mental impairment(s). The decision must include a
6          specific finding as to the degree of limitation in each of the functional areas described in
           paragraph (c) of this section.
7
    20 C.F.R. § 416.920a(e)(2).  The ALJ must therefore rate, and include in the decision, (1) the
8
    claimant's functional limitations in the areas of daily activities, social functioning, and
9
    concentration, persistence or pace as being either none, mild, moderate, marked, or extreme; (2)
10
    the claimant's episodes of decompensation as either none, one or two, three or four or more.  20
11
    C.F.R. § 416.920a(c)(3)-(4), (e)(2).
12
            Plaintiff's contention that the ALJ does not provide any analysis of her mental impairment
13
    apart from his statements relating to Dr. Hirokawa is belied by his opinion.  At step three, the ALJ
14
    specifically found that Plaintiff had mild restrictions in activities of daily living and mild
15
    difficulties in maintaining social functioning.  AR 16-17.  He further found that Plaintiff had mild
16
    to moderate difficulties with concentration, persistence of pace.  AR 17.  Although the ALJ did
17
    not address episodes of decompensation, any resulting error was harmless as there was no
18
    evidence of any episodes in the record.  Batson v. Comm'r Soc. Sec., 359 F.3d 1190, 1197 (9th
19
    Cir. 2004) (finding an error harmless where it did not negate the validity of the ALJ's ultimate
20
    conclusion).   Plaintiff's claim is without merit and must be denied.
21
    C.      Hypothetical Question
22
            The Court need not address Plaintiff's contention that the ALJ erred in failing to include
23
    Dr. Hirokawa's finding as to her ability to complete a workday or workweek in the hypothetical
24
    question because, as explained above, the ALJ properly rejected this limitation.  An ALJ is only
25
    required to present the VE with those limitations he finds to be credible and supported by the
26
    evidence.  Osenbrock v. Apfel, 240 F.3d 1157, 1165-66 (9th Cir. 2001).
27

28

                                                    14

1    D.      Plaintiff's Credibility

2           Finally, Plaintiff argues that the ALJ erred in finding her statements not credible.

3           The ALJ is required to make specific findings assessing the credibility of plaintiff's

4    subjective complaints. *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991). "An ALJ is

5    not 'required to believe every allegation of disabling pain' or other non-exertional impairment,"

6    *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (citation omitted).  In rejecting the complainant's

7    testimony, "the ALJ must identify what testimony is not credible and what evidence undermines

8    the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996) (quoting *Varney v.

9    Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988)).  Pursuant to Ninth

10   Circuit law, if the ALJ finds that the claimant's testimony as to the severity of her pain and

11   impairments is unreliable, the ALJ must make a credibility determination with findings

12   sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit

13   claimant's testimony. *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

14          "The ALJ may consider at least the following factors when weighing the claimant's

15   credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's]

16   testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work

17   record, and testimony from physicians and third parties concerning the nature, severity, and effect

18   of the symptoms of which [claimant] complains." *Id.* (citing *Light v. Soc. Sec. Admin.*, 119 F.3d

19   789, 792 (9th Cir. 1997).  "If the ALJ's credibility finding is supported by substantial evidence in

20   the record, we may not engage in second-guessing." *Id.*

21          The ALJ began his credibility analysis by explaining that although Plaintiff has

22   degenerative disc disease of the cervical spine, more advanced at C5-C6 and C6-C7, "there are

23   only minimal findings on clinical examination."  AR 18.  Although the ALJ may not rely on a lack

24   of objective evidence alone, he may consider it as part of a credibility finding.  *Rollins*, 261 F.3d

25   at 857.

26          For example, Dr. Lessenger described the MRI as showing mild canal encroachment at

27   C5-C6 and mild to moderate degenerative joint disease at C5-C6 and C6-C7.  AR 18, 165.

28   During his examination, although Plaintiff's neck was tender, she had full range of motion.  Her

grip strength was slightly reduced on the right.  Her back was non-tender and had full range of motion.  Bent and straight leg raises did not produce pain.  Plaintiff had full range of motion in all joints, and there was no swelling, tenderness or atrophy.  AR 165-166.  Moreover, Dr. Chahil found normal muscle strength in both of Plaintiff's upper extremities and although the nerve conduction study was abnormal, there was no evidence of polyneuropathy or ongoing cervical radiculopathy.  AR 174.  Dr. Lewis found that grip strength in the right hand was only minimally decreased compared to the left and motor strength of the right upper extremity was only minimally decreased in the triceps.  AR 18.  Dr. Lewis also noted that Plaintiff could easily take her shoes off and on and had no difficulties maneuvering on and off the examination table.  AR 18.  Dr. Nguyen noted that Plaintiff's neck was supple and that she had good range of motion of the cervical spine in all directions.  AR 19, 262.

The ALJ next discussed Plaintiff's medication and reaction to treatment suggestions.  He explained three physicians noted that Plaintiff "took no prescription or over-the-counter pain medication, which is inconsistent with a chronic, debilitating pain disorder."  AR 19.  Indeed, in December 2004, January 2005, and October 2005, Plaintiff reported to her physicians that she was not taking any medication.  AR 163, 192, 253.  *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) (evidence of "conservative treatment," such as a claimant's use of only over-the-counter pain medication, is sufficient to discount a claimant's testimony regarding severity of an impairment).  As the ALJ also noted, Plaintiff chose not to undergo any of the treatments recommended on two occasions, nor did she seek alternative treatments other than chiropractic treatment.  AR 19, 182, 186.  The ALJ is allowed to make inferences logically flowing from the record.  *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996).

The ALJ also noted the inconsistencies in Plaintiff's reports of activities.  AR 19.  For instance, although Plaintiff testified that she could only lift five pounds, she told Dr. Lewis in October 2005, that she shopped and took out the garbage.  AR 19, 253.  Plaintiff also testified that she has difficulty performing repetitive activities due to hand cramping, but later testified that she could keyboard for 30 minutes.  AR 19, 293.  Plaintiff told Dr. Lewis and Dr. Hirokawa that she could wash dishes, clean the house, sweep, vacuum and do yard work, although she indicated that

the activities caused pain.  AR 212, 253.  She also reported to Dr. Lewis that she was able to shop for herself, drive, fix meals, bathe, dress, read, use the phone and take the bus.  AR 19, 253. Plaintiff's reports of her daily activities, as well as inconsistencies therein, are proper areas of consideration.  *Thomas*, 278 F.3d at 958.

Finally, the ALJ noted that Plaintiff told Dr. Hirokawa in October 2005 that she was actively seeking employment, an activity obviously inconsistent with her claim of disability.  AR 19, 210.

In support of her argument, Plaintiff relies mainly on the medical evidence and suggests that her longitudinal history of seeking treatment lends support to her allegations.  While this man be true, Plaintiff's medical history is not the only factor for consideration in a credibility analysis, nor does her disagreement with the ALJ's interpretation thereof render his credibility determination improper.

Plaintiff's claim is without merit and must be denied.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, IRENE ESCAMILLA.


IT IS SO ORDERED.

Dated:   **June 10, 2008**                    **/s/ Dennis L. Beck**
                                       UNITED STATES MAGISTRATE JUDGE

17